**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**

| | |
|---|---|
| CHRISTINE M. FINNIGAN, ) | |
| ) | Civil Action No. _____ |
| Plaintiff, ) | |
| ) | |
| v. ) | |
| ) | |
| JAMES MENDRICK, in his official ) | |
| capacity as Sheriff of DuPage County; ) | |
| ANTHONY ROMANELLI, in his official ) | |
| capacity as the Chief of the Corrections ) | |
| Bureau of the DuPage County Sheriff's ) | |
| Office, ) | |
| ) | |
| Defendants. ) | |

## COMPLAINT

Plaintiff Christine M. Finnigan complains against Defendants James Mendrick, Sheriff of DuPage County ("Sheriff Mendrick"), and Anthony Romanelli, the Chief of the Corrections Bureau of the DuPage County Sheriff's Office (jointly, "the Defendants"), as follows:

## INTRODUCTION

1. This is a civil rights action challenging the life-threatening and discriminatory denial of adequate medical care in the DuPage County Correctional Facility ("DuPage County Jail"). Defendant Sheriff Mendrick and Defendant Anthony Romanelli, who oversee the facility, are legally obligated to meet the medical needs of people in custody. Yet when those medical needs concern opioid use disorder (or "OUD"), a deadly disease that afflicts millions, Defendants fail to do so. This failure violates the Eighth Amendment to the United States Constitution and the Americans with Disabilities Act ("ADA"), and places Ms. Finnigan in grave and immediate danger.

2.      OUD is a chronic disease. The medical standard of care for OUD treatment is "medication for addiction treatment" (also known interchangeably as "medication-assisted treatment" or "MAT", and "medication for opioid use disorder" or "MOUD"). There are three MAT medications approved by the Food and Drug Administration ("FDA"): methadone, buprenorphine, and naltrexone. MAT also consists of other supportive services based on the needs of individuals. While these supportive services are important, the medications drive MAT's efficacy. Their duration and dosing must be based on an individualized consideration of a person's medical needs by a trained medical professional. Much like the medication-based treatment for any other chronic disease, the medically necessary duration of MAT is generally lengthy and, in some cases, lifelong. Once a patient is being treated successfully for OUD through MAT, forcibly ending that treatment will cause the patient to experience excruciating withdrawal symptoms and puts them at heightened risk for relapse, overdose, and death.

3.      Jails and prisons throughout the country and within the State of Illinois have begun to provide MAT to individuals in their custody. The Rhode Island, New Hampshire, and Vermont Departments of Corrections now provide all three FDA-approved mediations for OUD to individuals throughout their incarceration. Jails and prisons in California, Colorado, Massachusetts, Maryland, New Jersey, and North Dakota are increasingly doing the same, as is the Cook County Jail in Illinois. In the last two years, the Federal Bureau of Prisons settled two federal lawsuits by agreeing to provide MAT to individuals throughout their incarceration.

4.      Upon information and belief, the DuPage County Jail has a policy and practice of refusing to permit incarcerated individuals to be medically treated with methadone or buprenorphine ("Compulsory Withdrawal Policy"). Thus, rather than providing MAT, the Jail's policy and practice is to deny prescribed medical care to people with OUD in its custody, and to

force them to withdraw from their methadone or buprenorphine maintenance treatment and experience the associated severe and potentially life-threatening harms.

5.     In August 2019, Ms. Finnigan was diagnosed with OUD and was prescribed a daily methadone maintenance dose based on her individual medical needs. This medical treatment is helping to keep her alive.

6.     In 2016, Ms. Finnigan was charged with driving under the influence (two counts), operating an uninsured vehicle, and improper lane usage, which her criminal attorney expects to result in a sentence in jail. She has a hearing related to this case on January 21, 2021, after which she expects to be incarcerated in the DuPage County Jail, either immediately or in the near future, if there is an adjournment of the court date.

7.     Defendants are aware of Ms. Finnigan's diagnosis and treatment. However, the Defendants have refused to assure Ms. Finnigan that she can take her prescribed medication while incarcerated at the DuPage County Jail. They have not given her reason to believe that they will deviate from their policy and practice of denying methadone and buprenorphine maintenance treatment to residents.

8.     Due to the DuPage County Jail's policy and practice, Ms. Finnigan has reason to believe she could be forced into acute withdrawal. Such withdrawal would be extremely painful, and could also lead to life-threatening medical complications. Further, acute withdrawal would place Ms. Finnigan at a severely increased risk of relapse, overdose, and death.

9.     As applied to Ms. Finnigan, Defendants' policy and practice is unlawful. Defendants' policy and practice of denying methadone and buprenorphine maintenance treatment for OUD reflects deliberate indifference to Ms. Finnigan's serious medical needs, to her suffering, and to the long-term consequences of forced withdrawal. Defendants' actions,

therefore, violate Ms. Finnigan's Eighth Amendment right to be free from cruel and unusual punishment. Additionally, Defendants' denial of the necessary medical care through deviations from the standard of care violates Ms. Finnigan's right, under the ADA, to be free from discrimination based on her disability.

10.     Ms. Finnigan brings this action under 42 U.S.C. § 1983 to enforce her rights under the Eighth Amendment and under 42 U.S.C. §§ 12131-12134 to enforce her ADA rights. She seeks declaratory and injunctive relief to require Defendants to provide her with necessary medical care and prevent unnecessary suffering and possible death. Specifically, she seeks declaratory relief and an injunction requiring the Defendants to provide her with access to her medically necessary, physician-prescribed methadone during the duration of her incarceration at DuPage County Jail.

## PARTIES

11.     Plaintiff Christine Finnigan is a resident of Cook County, Illinois.

12.     Defendant James Mendrick, is the Sheriff of DuPage County. As such, he is the legal custodian of all pre-trial detainees and prisoners housed at DuPage County Jail and is responsible for the safe, secure, and humane treatment of these residents, including their medical care. He is sued in his official capacity for declaratory and injunctive relief.

13.     At all times relevant to this Complaint, Defendant James Mendrick was acting under the color of state law.

14.     Defendant Anthony Romanelli is the Chief of the Corrections Bureau of the DuPage County Sheriff's Office. Defendant Romanelli is the official charged by Defendant Mendrick with running the day-to-day operations of the DuPage County Jail. He is sued in his official capacity for declaratory and injunctive relief.

15.     At all times relevant to this Complaint, Defendant Anthony Romanelli was acting under the color of state law.

## JURISDICTION AND VENUE

16.     This action seeks to vindicate rights guaranteed by the Eighth Amendment to the United States Constitution, pursuant to 42 U.S.C. § 1983.

17.     This action is also brought pursuant to Title II of the Americans with Disabilities Act, 42 U.S.C. §§ 12131-12134.

18.     This Court has original jurisdiction over this action pursuant to 28 U.S.C. § 1331 because this action arises under federal law. Jurisdiction is also authorized pursuant to 28 U.S.C. § 1343(a)(3).

19.     Venue in this Court is proper under 28 U.S.C. § 1391(b) because the events giving rise to this action occurred within this judicial district.

## FACTS

**A.      Opioid Use Disorder Is a Life-Threatening Medical Condition and a Public Health Crisis.**

20.     Opioids are a class of drugs that inhibit pain and can have euphoric side effects. Many opioids have legitimate medical uses, including chronic pain management. Others, such as heroin, are not generally used in medicine in the United States but are sold on the black market.

21.     OUD is a chronic brain disease with potentially deadly complications. Signs of OUD include cravings of opioids, increased tolerance to opioids, an inability to stop using opioids, withdrawal symptoms, and a loss of control.

22.     Like other chronic diseases, OUD often involves cycles of relapse and remission.

23.     Without treatment, patients with OUD are frequently unable to control their use of opioids. OUD is progressive and can result in disability or premature death,

5

including due to accidental overdose.

24.     OUD is a national public health crisis. As of 2016, 2 million Americans suffered from this disease.[1] Between 1999 and 2018, more than 450,000 people died from opioid overdose.[2] The number of opioid overdose deaths in 2018 was four times higher than in 1999.[3] In 2018, more than 67,000 people died from drug overdose, and 70 percent of these deaths involved opioids.[4]

25.     In Illinois, there were 2,219 confirmed opioid-related overdose deaths in 2019.[5] In 2020, opioid-related overdose deaths in Illinois rapidly rose, with the state seeing an increase from 197 deaths in January to 269 deaths in May.[6] In May of 2020, DuPage County saw a spike in opioid-related overdose deaths, with more than 20 overdose deaths in the span of three weeks.[7] The rate of overdose deaths in DuPage County from January 2020 to June 2020 was 52% higher than the rate of overdose deaths from January to June of 2019.[8]

26.      OUD is especially dangerous for people who are or have been incarcerated.

27.     As the 2017 Final Report from President Trump's Commission on Combating

---

[1] Substance Abuse & Mental Health Servs. Admin., *Medications for Opioid Use Disorder, Treatment Improvement Protocol Tip 63 for Healthcare and Addiction Professionals, Patients, and Families* at 3-1 (2018), https://www.ncbi.nlm.nih.gov/books/NBK535268/pdf/Bookshelf_NBK535268.pdf.
[2] Ctrs. for Disease Control and Prevention, *Opioid Overdose, Understanding the Epidemic*, https://www.cdc.gov/drugoverdose/epidemic/index.html (last updated Mar. 19, 2020).
[3] *Id.*
[4] *Id*.
[5] Ill. Dep't of Pub. Health, *IDPH Data*, https://www.dph.illinois.gov/opioids/idphdata (last visited Jan. 19, 2021).
[6] Ill. Dep't of Pub. Health, *Semiannual Opioid Overdose Report 2020* 4 (Sept. 2020), https://www.dph.illinois.gov/sites/default/files/publications/semiannual-opioid-overdose-report9292020final.pdf.
[7] The Cty. of DuPage, *Public Safety Announcement: Surge in Overdose Deaths* (May 13, 2020), https://www.dupageco.org/Coroner/Coroner_News/2020/62840/.
[8] The Cty. of DuPage, *Public Safety Announcement: Surge in Overdose and Suicide Deaths* (Aug. 20, 2020), https://www.dupageco.org/Coroner/Coroner_News/2020/63300/.

Drug Addiction and the Opioid Crisis explained, "[i]n the weeks following release from jail or prison, individuals with or in recovery from OUD are at elevated risk of overdose and associated fatality."[9]

28. In Illinois, the Governor's three-year action plan, implemented in 2017 to reduce opioid-related deaths by one third, calls for increased access to evidence-based treatments, including MAT with methadone or buprenorphine, and non-stigmatizing information.[10] One component of the plan is to increase access to MAT for justice-involved individuals, including in correctional settings, because, "[p]rison-based treatment followed by aftercare in the community can reduce recidivism and save money over time."[11]

**B.** **MAT is the Standard of Care for Opioid Use Disorder.**

29. MAT "is a comprehensive approach that combines FDA-approved medications… with counseling and other behavioral therapies to treat patients with opioid use disorder (OUD)."[12] The primary driver of treatment efficacy in the MAT regimen is the medication.

30. Three medications used in MAT are methadone (sold under brand names such as Dolophine and Methadose), buprenorphine (sold under brand names such as Subutex, Suboxone, Sublocade, and Bunavail), and naltrexone (sold under brand names such as ReVia and Vivitrol).

---

[9] The White House, *The President's Commission on Combating Drug Addiction and the Opioid Crisis* (Nov. 2017) https://trumpwhitehouse.archives.gov/sites/whitehouse.gov/files/images/Final_Report_Draft_11-15-2017.pdf (hereinafter "President's Commission").

[10] State of Ill., *State of Illinois Opioid Action Plan* at 15 (Sept. 2017), https://dph.illinois.gov/sites/default/files/publications/Illinois-Opioid-Action-Plan-Sept-6-2017-FINAL.pdf.

[11] *Id.* at 29.

[12] Food & Drug Admin., *FDA Approves First Generic Version of Suboxone Sublingual Film, Which May Increase Access to Treatment for Opioid Dependence* (June 14, 2018), https://www.fda.gov/news-events/press-announcements/fda-approves-first-generic-versions-suboxone-sublingual-film-which-may-increase-access-treatment.

The FDA has approved these medications for treating opioid addiction.

31.    Naltrexone works by blocking opioids from producing their euphoric effects and thus reducing a desire for opioids over time. Methadone and buprenorphine act through a different mechanism: both activate, rather than block, opioid receptors to relieve withdrawal symptoms and control cravings.

32.    Because they act on opioid receptors without presenting the same risk of overdose that heroin and fentanyl do, methadone and buprenorphine have been deemed "essential medicines" by the World Health Organization.[13] Repeated use of opioids results in fundamental changes to brain structure and function, particularly the parts of the brain that are responsible for reward and motivation.[14] These changes to brain structure and function promote compulsive drug use despite adverse consequences and make stopping opioid use difficult.[15] Methadone and buprenorphine, which do not produce euphoric effects, help normalize brain function and decrease symptoms of addiction such as cravings and withdrawal.[16]

33.    As with many prescription medications, patients' responses to these medications are individualized. A patient may find that only one of these medications and only certain doses provide effective treatment without significant adverse side effects. Injectable naltrexone is not a substitute for methadone or buprenorphine.

34.    In addition, much like the treatment for other chronic diseases, MAT maintenance is generally lengthy, and sometimes lifelong. As the FDA recognizes, there is no maximum

---

[13] See Greg Herget, *Methadone and Buprenorphine Added to the WHO List of Essential Medicines,* HIV/AIDS POL'Y & L. REV. at 23 (Dec. 2005).
[14] See Nat'l Acad's of Sci., Eng'g, and Med., *Medications for Opioid Use Disorder Save Lives* 23-24 (2019), https://www.nap.edu/catalog/25310/medications-for-opioid-use-disorder-save-lives.
[15] See id.
[16] See id. at 35-36.

recommended duration for maintenance treatment on methadone, buprenorphine, or naltrexone; it may continue indefinitely.[17]

35.     Methadone and buprenorphine can also be used for medically managed withdrawal—also known as "medically supervised withdrawal" or "detoxification"—which is not MAT and does not constitute treatment of OUD.[18] Medically managed withdrawal attempts only to ease the physical symptoms of withdrawal for a limited time.

36.     As the federal Substance Abuse and Mental Health Services Administration ("SAMHSA") explains, maintenance MAT "[p]rovid[es] medications to achieve and sustain clinical remission of signs and symptoms of OUD and support the individual process of recovery without a specific endpoint (as with the typical standard of care in medical and psychiatric treatment of other chronic illnesses)," whereas medically managed withdrawal "[u]s[es] an opioid agonist . . . in tapering doses or other medications to help a patient discontinue illicit or prescription opioids."[19]

37.     Medically managed withdrawal does not improve long-term outcomes for individuals struggling with OUD. In fact, "[p]atients who complete medically supervised withdrawal are at risk of opioid overdose."[20]

38.     In contrast, studies show that MAT improves retention in treatment, increases abstinence from illicit drugs, and decreases mortality. MAT has been shown to decrease opioid

---

[17] *See* Food & Drug Admin., *Information About Medication-Assisted Treatment (MAT)* (Feb. 14, 2019), https://www.fda.gov/drugs/information-drug-class/information-about-medication-assisted-treatment-mat.
[18] *See* Substance Abuse & Mental Health Servs. Admin., *supra* note 1, at ES-3.
[19] *Id.* at 2.2.
[20] *Id.* at 1-9.

use, opioid-related overdose deaths, criminal activity, and infectious disease transmission.[21] MAT has also been shown to increase patients' social functioning and retention in treatment.

39.     Studies have shown that maintenance medication treatments of OUD reduce all-cause and overdose mortality and have a more robust effect on treatment efficacy than behavioral components of MAT, such as counseling.[22] Methadone and buprenorphine have been clinically proven to reduce opioid use more than (1) no treatment, (2) outpatient treatment without medication, (3) outpatient treatment with placebo medication, and (4) detoxification only.

40.     One study documented the treatment outcomes from a detoxification facility and showed (1) a twenty-nine percent relapse on the day of discharge, (2) a sixty percent relapse after one month, and (3) a success rate of between only five to ten percent after one year.[23]

41.     Once a patient is successfully recovering from OUD through MAT, arbitrarily and involuntarily ceasing the medication or decreasing the dosage violates the standard of care and, in the case of methadone and buprenorphine, will cause excruciating withdrawal symptoms unless the patient is tapered over the course of many months or years. Withdrawal symptoms include severe dysphoria (a feeling of dissatisfaction or restlessness), cravings for opiates, irritability, sweating, nausea, tremors, vomiting, insomnia, and muscle pain. These symptoms can sometimes lead to life-threatening complications.

---

[21] Nora D. Volkow et al., *Medication-Assisted Therapies — Tackling the Opioid Overdose Epidemic*, 370 NEW ENG. J. MED. 2063, 2064 (2014); Nat'l Inst. on Drug Abuse, *Effective Treatments for Opioid Addiction* (Nov. 2016), https://www.drugabuse.gov/publications/effective-treatments-opioid-addiction.

[22] *See* Laura Amato et al., *Psychosocial Combined with Agonist Maintenance Treatments Versus Agonist Maintenance Treatments Alone for Treatment of Opioid Dependence*, 10 COCHRANE DATABASE SYSTEMIC REVS. (Oct. 5, 2011), at 2.

[23] Genie L. Bailey et al., *Perceived Relapse Risk and Desire For Medication Assisted Treatment Among Persons Seeking Inpatient Opiate Detoxification*, 45 J. SUBST. ABUSE TREATMENT 302, 304–05 (2013); George E. Valiant, *What Does Long-Term Follow-Up Teach Us About Relapse and Prevention of Relapse in Addiction?*, 83 BRITISH J. ADDICTION 1147, 1152–57 (1988).

C.     **Both the U.S. Government and Illinois Have Adopted the Medical and Scientific Consensus that Medication for Addiction Treatment Is the Standard of Care for Opioid Use Disorder.**

42.     Embracing the medical and scientific consensus, numerous U.S. government entities have expressly endorsed the necessity of MAT, including: the Department of Health and Human Services (HHS),[24] the FDA,[25] the National Institute on Drug Abuse (NIDA),[26] President Trump's Commission on Combating Drug Addiction and the Opioid Crisis,[27] the Office of

---

[24] *See, e.g.,* Food & Drug Admin., *FDA Takes New Steps to Encourage the Development of Novel Medicines for the Treatment of Opioid Use Disorder* (Aug. 6, 2018), https://www.fda.gov/NewsEvents/Newsroom/PressAnnouncements/ucm615892.htm (Health and Human Services Secretary Alex Azar explaining that "'[t]he evidence is clear: medication-assisted treatment works, and it is a key piece of defeating the drug crisis facing our country'").

[25] *See, e.g.*, *id.* (Former FDA Commissioner Dr. Scott Gottlieb underscored that "'[w]e're committed to doing our part to expand access to high-quality, effective medication-assisted treatments and encouraging health care professionals to ensure patients with opioid use disorder are offered an adequate chance to benefit from these therapies." He continued, "This work also includes improving understanding about the treatment options available for patients and countering the unfortunate stigma that's sometimes associated with their use.'").

[26] *See, e.g.*, Nat'l Inst. on Drug Abuse, *What Science Tells Us About Opioid Abuse and Addiction* (Jan. 27, 2016), https://www.drugabuse.gov/about-nida/legislative-activities/testimony-to-congress/2016/what-science-tells-us-about-opioid-abuse-and-addiction (Testifying before the Senate Judiciary Committee in late January 2016, NIDA Director Dr. Nora Volkow explained that "[m]edications have become an essential component of an ongoing treatment plan, enabling opioid-addicted persons to regain control of their health and their lives." She emphasized that "[t]he evidence supports long-term maintenance with these medicines in the context of behavioral treatment and recovery support, not short-term detoxification programs aimed at abstinence.").

[27] *See, e.g.*, President's Commission, *supra* note 9, at 68 (noting that treatment for opioid use disorder "should include" five elements including "[a]ccess to MAT (e.g., methadone, buprenorphine/naloxone, naltrexone)" and that "[c]hoice of medication should be made by a qualified professional in consultation with patient, and based on clinical assessment").

National Drug Control Policy (ONDCP),[28] and SAMHSA.[29]

43.     HHS has confirmed that MAT is the standard of care for OUD. An April 2019 HHS Fact Sheet declares that "we know that medication-assisted treatment is the standard of care for opioid use disorder."[30]

44.     SAMHSA has emphasized that MAT is more effective in reducing illicit opioid use than treatment with no medication.[31] SAMHSA has concluded that "just as it is inadvisable to deny people with diabetes the medication they need to help manage their illness, it is also not sound medical practice to deny people with OUD access to FDA-approved medications for their illness."[32] SAMHSA has also highlighted that "dosing and schedules of pharmacotherapy must be individualized,"[33] and that some individuals may require "lifelong treatment."[34]

45.     The Department of Justice has also confirmed that MAT is the standard of care for the treatment of OUD. As recently as January 14, 2021, the U.S. Department of Justice instructed a New Jersey jail to provide MAT because the failure to do so violates the

---

[28] *See, e.g.*, Off. of Nat'l Drug Control Pol'y, *National Drug Control Strategy* 10 (Jan. 2019), https://www.whitehouse.gov/wp-content/uploads/2019/01/NDCS-Final.pdf (hereinafter "National Drug Control Strategy") ("The Administration will work across the Federal government to remove barriers to substance use disorder treatments, including those that limit access to any forms of FDA-approved MAT, counseling, certain inpatient/residential treatment, and other treatment modalities.").

[29] *See, e.g.,* Substance Abuse & Mental Health Servs. Admin., supra note 1, at 1-3 ("Ongoing [] medication treatment for OUD is linked to better retention and outcomes than treatment without medication[,]" and certain MAT medications, including buprenorphine, "were [] found to be more effective in reducing illicit opioid use than no medication" and "have also been associated with reduced risk of overdose death.").

[30] U.S. Dep't of Health & Hum. Servs., *Fact Sheet: Combating the Opioid Crisis* (Apr. 24, 2019), https://www.hhs.gov/sites/default/files/opioids-fact-sheet-april-2019.pdf.

[31] Substance Abuse & Mental Health Servs. Admin., *supra* note 1, at ES-2.

[32] *Id.*

[33] *Id.* at ES-5.

[34] *Id.* at ES-2.

Constitution.[35] The DOJ concluded that a county jail "knew or should have known that MAT is the standard of care for treating Opioid Use Disorder."[36]

46.     The Illinois Department of Public Health emphasizes the need for increasing access to MAT in the state to address the opioid epidemic, stating that MAT's high efficacy is supported by decades of clinical research.[37] The Department emphasizes that treatment decisions are unique to the individual, and notes that, like taking medication for diabetes, MAT helps people manage OUD so that they can maintain their recovery.[38]

**D.     Providing Medication for Addiction Treatment Is Particularly Important, and Administrable, in Correctional Settings.**

47.     Withholding prescribed MAT from incarcerated people with OUD can be deadly. As President Trump's Commission on Combating Drug Addiction and the Opioid Crisis has explained, "MAT has been found to be correlated with reduced risk of mortality in the weeks following release" from incarceration, and a "large study of individuals with OUD released from prison found that individuals receiving MAT were 75% less likely to die of any cause and 85% less likely to die of drug poisoning in the first month after release."[39]

48.     Withholding MAT in jails and prisons also forces incarcerated individuals into an untenable choice between experiencing acute withdrawal or purchasing methadone or buprenorphine on the black market to continue their life-saving treatment. The first is extraordinarily painful, and the second risks discipline, retaliation, improper dosage or

---

[35] United States Department of Justice Civil Rights Division, I*nvestigation of the Cumberland County Jail (Bridgeton, New Jersey)*, (Jan. 14, 2021), https://www.justice.gov/opa/press-release/file/1354646/download
[36] *Id*. at 8.
[37] *See* Ill. Dep't of Pub. Health, *Medication-Assisted Treatment FAQ* 2, https://www.dph.illinois.gov/sites/default/files/publications/MAT-FAQ-021418.pdf.
[38] *See id.*
[39] President's Commission, *supra* note 9, at 72.

medication, accidental overdose, and an increased period of incarceration.

49.     Given the serious risks that OUD poses for incarcerated people, numerous

authorities require or recommend that jails and prisons provide MAT to those in their custody.

50.     For example, the Department of Justice's Adult Drug Court Discretionary Grant

Program requires grantees to permit the use of MAT.[40]

51.     On behalf of the Trump Administration, the ONDCP's 2019 report establishes

"increasing the availability of MAT for incarcerated individuals" as a priority initiative.[41]

52.     SAMHSA identifies making treatment available to criminal justice populations as

one of the remaining challenges in fighting the opioid public health crisis.[42]

53.     In a 2018 report, the National Sheriffs' Association and the National Commission

on Correctional Health Care explain that "correctional withdrawal alone actually increases the

chances the person will overdose following community release due to loss of opioid tolerance"

and "[f]or this reason, all individuals with OUD should be considered for MAT" while they are

incarcerated.[43] This report emphasizes that providing MAT in jails and prisons can

"[c]ontribut[e] to the maintenance of a safe and secure facility for inmates and staff" and reduce

recidivism, withdrawal symptoms, the risk of post-release overdose and death, and disciplinary

---

[40] U.S. Dep't of Justice, *Adult Drug Court Discretionary Grant Program FY 2018 Competitive Grant Announcement* 13 (June 5, 2018), https://www.bja.gov/funding/DrugCourts18.pdf.
[41] National Drug Control Strategy, *supra* note 28, at 9.
[42] Substance Abuse & Mental Health Servs. Admin., *Medication-Assisted Treatment for Opioid Addiction in Opioid Treatment Programs, A Treatment Improvement Protocol TIP 43* 6-8 (2017),
https://www.asam.org/docs/advocacy/samhsa_tip43_matforopioidaddiction.pdf?sfvrsn=0.
[43] Nat'l Sheriffs' Ass'n, *Jail-Based Medication-Assisted Treatment, Promising Practices, Guidelines, and Resources for the Field* 9 (Oct. 2018), https://www.sheriffs.org/publications/Jail-Based-MAT-PPG.pdf (hereinafter "Nat'l Sheriffs' Ass'n"); *see also id.* at 21 ("Jails should establish systems to ensure that detainees and sentenced inmates who had been receiving MAT, particularly methadone and buprenorphine, prior to their arrest have MAT continued when feasible.").

problems.[44] It further highlights the dangers of involuntary withdrawal from MAT in carceral settings, noting that, "forced detoxification of prescribed opioid medication, such as methadone, can undermine an individual's willingness to engage in MAT in the future, compromising the likelihood of long-term recovery."[45]

54.     The American Society of Addiction Medicine, the leading professional society in the country on addiction medicine, also recommends treatment with MAT for people with OUD in the criminal justice system.[46]

55.     The National Academies of Science, Engineering, and Medicine cautions that lack of access to MAT in prisons and jails leads to a greater relapse and overdose rates.[47]

56.     As these authorities recognize, providing MAT in correctional settings saves lives and is administrable.

57.     Many jails and prisons now provide access to MAT to incarcerated individuals. In Illinois, the Cook County Jail offers all three medications in combination with behavioral health services.

58.     A rapidly increasing number of other correctional facilities throughout the country also follow the medical standard of care and allow residents to continue with MAT during incarceration. Examples include Bernalillo County Metropolitan Detention Center (New Mexico); Rikers Island Correctional Facility (New York); Kings County Jail (Washington State);

---

[44] *Id.* at 5-6.

[45] *Id.* at 21.

[46] Kyle Kampman & Margaret Jarvis, *American Society of Addiction Medicine (ASAM) National Practice Guideline for the Use of Medications in the Treatment of Addiction Involving Opioid Use,* 9 J. ADDICTION MED. 1, 4-6 (2015).

[47] Nat'l Acad's of Sci., Eng'g, and Med., *supra* note 14, at 99 ("People with a history of OUD have a demonstrably high risk of mortality following release from incarceration. One study found an all-cause mortality rate of 737 per 100,000 person-years among former prisoners, with opioids related to almost 15 percent of all deaths.") (internal citations omitted).

Orange County Jail (Florida). The Rhode Island and Vermont Departments of Correction make MAT available to all individuals suffering from OUD throughout their entire sentence, even those who were not receiving MAT before being incarcerated. Jails and prisons in California, Colorado, Massachusetts, Maryland, New Jersey, and North Dakota are increasingly doing the same.

59.     Following the medical standard of care yields positive results in correctional settings. After the first year of the program within the Rhode Island Department of Corrections, 95% of individuals who were on MAT during the periods of their incarceration continued with their treatment after their release.[48] "Research showed that this program reduced post-release deaths by 60 percent and all opioid-related deaths in the state by more than 12 percent."[49] "Many participants stated that an ancillary benefit to the program was a lower prevalence of illicit drugs in the facility due to decreased need to use among people who are incarcerated."[50]

### E.     Ms. Finnigan is Diagnosed with Opioid Use Disorder and Prescribed Methadone Maintenance Treatment Based on Her Individual Medical Needs.

60.     Ms. Finnigan is diagnosed with OUD, a serious medical need and recognized disability. Her OUD substantially limits and has limited one or more of her major life activities, including neurological and brain function, caring for herself, and interacting with others. Her methadone maintenance treatment is medically necessary, as determined by a medical doctor exercising her professional judgment. If untreated, Ms. Finnigan's OUD will likely result in relapse and a potentially fatal opioid overdose, among other things.

---

[48] Nat'l Sheriffs' Ass'n, *supra* note 43, at 29.

[49] *Id.*

[50] Lauren Brinkley-Rubinstein et al., *The Benefits and Implementation Challenges of the First State-Wide Comprehensive Medication for Addictions Program in a Unified Jail and Prison Setting*, 205 DRUG AND ALCOHOL DEPENDENCE (Dec. 2019), at 3.

61.     Ms. Finnigan has struggled with opioid addiction for nearly twenty years. Opioid use disorder is common in Ms. Finnigan's family. She has four brothers. Three of those brothers died at the age of 26 of drug overdoses. The remaining brother has a daughter who died last Christmas Eve, also at the age of 26, of a drug overdose.

62.     Before entering recovery with methadone, Ms. Finnigan tried straight detoxification numerous times but was never able to stay in active recovery. Ms. Finnigan took Suboxone, a brand of buprenorphine, for a period of time, but discontinued it when it became too expensive and difficult to obtain, and she was unable to maintain her recovery without it. Without Suboxone, Ms. Finnigan lost her home, her job of 18 years, and her salon. She also received a DUI in 2016, which puts her at risk of going to jail in this matter.

63.     In August 2019, Ms. Finnigan began treatment at the Bobby Buonauro Clinic in Evanston, Illinois. Based on an individualized assessment of her medical, addiction, and treatment history, Ms. Finnigan was prescribed methadone maintenance treatment for her OUD. With the help of this methadone maintenance treatment, which is medically necessary for the treatment of her serious medical condition, Ms. Finnigan was able to achieve and maintain active recovery.

64.     While living in the community and on methadone since August 2019, Ms. Finnigan's life has improved. Ms. Finnigan says that she feels like herself again and has met all treatment plan requirements. She is terrified of what will happen if she is not allowed to stay on methadone. Ensuring that she will remain on her methadone will set her up for success upon release.

65.     Without access to this medically necessary treatment, Ms. Finnigan faces a high risk of relapse, overdose, and death.

**F.      Without Judicial Intervention, Ms. Finnigan Will Be Denied Medically Necessary Treatment for Her Opioid Use Disorder While Incarcerated at the DuPage County Jail.**

66.      Ms. Finnigan faces an imminent sentence at the DuPage County Jail, where Defendants' policies will force Ms. Finnigan into dangerous and potentially life-threatening withdrawal.

67.      On or shortly after January 21, 2021, Ms. Finnigan will face jail time due to a DUI charge in DuPage County Court, Village of Villa Park. Based on the expectation of her defense attorney, Ms. Finnigan will serve a sentence in the DuPage County Jail immediately or shortly after entry of her guilty plea.

68.      Upon information and belief, Defendants have a policy and practice of prohibiting the use of methadone and buprenorphine, even for individuals who suffer from OUD and are already undergoing treatment with these medications at the time of admission to the DuPage County Jail.

69.      Defendants, who oversee the DuPage County Jail, are obligated to ensure adequate medical care to detainees and prisoners in its custody, including those who suffer from OUD.

70.      Defendants, who oversee the DuPage County Jail, are responsible for setting policy governing the treatment of incarcerated individuals, including their access to medical care.

71.      Upon information and belief, it is the policy and custom of Defendants to prohibit incarcerated persons from taking methadone or buprenorphine.

72.      On January 19, 2021, after learning of Ms. Finnigan's situation, counsel for Ms. Finnigan sent a letter to Defendant Sheriff Mendrick requesting assurance that Ms. Finnigan will be provided with methadone during her time in their custody. The letter sought a reasonable

modification of the DuPage County Jail's policy or practice of not providing methadone. The letter requested a response by noon on January 20, 2021.

73.     On January 20, 2021 Defendant's counsel informed Ms. Finnigan that Defendants would not provide assurance that she could take her prescribed methadone while incarcerated. Instead, Defendants made a vague representation that they might permit her to take methadone while incarcerated, only if their own evaluation showed that methadone was "necessary." Defendants did not indicate who would conduct this evaluation, the qualifications of any individual who would conduct such an evaluation, nor the clinical criteria that individual would use. In light of Defendants' policy and practice of not providing methadone in the past, Ms. Finnigan reasonably believes that the DuPage County Jail will not find it "necessary" for her to continue methadone treatment while incarcerated, and will not facilitate access to her medication. Accordingly, Ms. Finnigan remains in fear that she will undergo forced withdrawal upon admission to jail or prison on or shortly after January 21, 2021.

## COUNT I - EIGHTH AMENDMENT

### (All Defendants—Deliberate Indifference to Serious Medical Need)

74.     The foregoing allegations are re-alleged and incorporated herein.

75.     Defendants, while acting under color of state law, deliberately, purposefully, and knowingly deny Plaintiff access to necessary medical treatment for her OUD, which is a serious medical need.

76.     Defendants' Compulsory-Withdrawal Policy automatically and forcibly denies individuals in their custody their prescribed methadone maintenance treatment.

77.     Denying Plaintiff's access to methadone maintenance treatment for her OUD will cause her physical and psychological suffering, will expose her to a substantial risk for other

serious medical harm, will expose her to a heightened risk of lowered tolerance to opioids, and to a heightened risk of relapse into active addiction, potentially resulting in relapse, overdose, and death.

78.     As applied to Plaintiff, Defendants' failure to adhere to standards of care amounts to deliberate indifference to a serious medical need, in violation of the Eighth Amendment's prohibition against cruel and unusual punishment.

## COUNT II - AMERICANS WITH DISABILITIES ACT

### (All Defendants—Unlawful Discrimination Against Qualified Individuals with Disabilities: Denial of Medical Services)

79.     The foregoing allegations are re-alleged and incorporated herein.

80.     DuPage County Jail, which is overseen and/or run by Defendant Sheriff Mendrick and Defendant Anthony Romanelli, Chief of the DuPage County Correction Bureau, is a public entity subject to the Americans with Disabilities Act (ADA).

81.     Drug addiction is a "disability" under the ADA. See 42 U.S.C. §§12102§ 35.108 (the phrase "physical or mental impairment includes, but is not limited to . . . drug addiction, and alcoholism.").

82.     The ADA applies to people, like Plaintiff, who suffer from OUD. Because she suffers from OUD, Plaintiff is a person with a disability.

83.     Ms. Finnigan is a "qualified individual with a disability" because she meets the essential eligibility requirements for the DuPage County Jail's medical services. 42 U.S.C. § 12131(2).

84.     Upon arrival at the DuPage County Jail, Plaintiff will be entitled to receive the benefits of the medical care system in the jail.

85.     On information and belief, Defendants do not forcibly deny or alter medically

necessary, physician-prescribed medications to incarcerated individuals with other serious, chronic medical conditions, such as diabetes.

86.     Defendants' compulsory-withdrawal policy automatically and forcibly removes individuals in their custody from their prescribed methadone maintenance treatment.

87.     Defendants deny Plaintiff the benefits of the DuPage County Jail's medical programs on the basis of her disability.

88.     Defendants refuse to make a reasonable accommodation for Plaintiff by providing her with access to her prescribed MAT medication during her incarceration, even though accommodation would not alter the nature of the healthcare program.

## PRAYER FOR RELIEF

Wherefore, Plaintiff asks this Court to GRANT the following relief:

1.     Injunctive relief ordering Defendants to provide Plaintiff with access to her methadone maintenance treatment, at doses prescribed by her medical provider, during her entire term of incarceration;

2.     A declaratory judgment holding that, as applied to Plaintiff, Defendants' policy and practice of denying methadone and buprenorphine maintenance treatment for OUD violates the Eighth Amendment;

3.     A declaratory judgment holding that, as applied to Plaintiff, Defendants' policy and practice of denying methadone and buprenorphine maintenance treatment for OUD violates the ADA

4.     Awarding Plaintiff attorneys' fees and costs;

5.     Any further relief this Court deems just and proper.

Dated: January 20, 2021

Respectfully submitted,
CHRISTINE FINNIGAN

By her attorneys,

/s/ Sally Friedman
Sally Friedman*
Rebekah Joab*
Legal Action Center
225 Varick St., 4th Fl.
New York, NY 10014
(212) 243-1313
sfriedman@lac.org
rjoab@lac.org
*Pro hac vice petition pending

/s/ Nusrat J. Choudhury
Nusrat J. Choudhury
Camille Bennett
Roger Baldwin Foundation of ACLU, Inc.
150 N. Michigan Avenue, Suite 600
Chicago, IL 60601
(312) 207-9740
nchoudhury@aclu-il.org
cbennett@aclu-il.org

/s/ Maggie E. Filler
Maggie E. Filler*
Roderick and Solange MacArthur Justice Center
Northwestern Law School Bluhm Legal Clinic
160 E. Grand Avenue, 6th Floor
Chicago, Illinois 60611
(312) 503-0899
Maggie.filler@macarthurjustice.org
*Pro hac vice petition pending

/s/ Maria Morris
Maria Morris*
Joseph Longley**
American Civil Liberties Union
National Prison Project
915 15th Street NW
Seventh Floor
Washington, DC 20005
(202) 548-6602
Mmorris@aclu.org
jlongley@aclu.org
*Pro hac vice petition pending
**Pro hac vice petition pending; Not admitted in DC; practice limited to federal courts