UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| CHRISTINE M. FINNIGAN, | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 21-cv-341 |
| | ) | |
| v. | ) | Hon. Steven C. Seeger |
| | ) | |
| JAMES MENDRICK, in his official capacity as Sheriff of DuPage County, and ANTHONY ROMANELLI, in his official capacity as the Chief of the Corrections Bureau of the DuPage County Sheriff's Office, | ) ) ) ) ) ) | |
| | ) | |
| Defendants. | ) ) | |

**MEMORANDUM OPINION AND ORDER**

Tomorrow, Plaintiff Christine Finnigan will begin serving a 30-60 day sentence at the DuPage County Jail for drunk driving. She suffers from opioid use disorder, and takes methadone (a synthetic opioid) as part of her recovery. *See Davis v. Carter*, 452 F.3d 686, 688 n.3 (7th Cir. 2006) ("Methadone is a synthetic narcotic that is used to treat narcotic withdrawal and dependence. It is typically taken orally once per day and suppresses narcotic withdrawal symptoms between 24 and 36 hours."). She is concerned that she will not receive methadone while incarcerated at the Jail.

She filed suit under the Eighth Amendment and the Americans with Disabilities Act, seeking declaratory and injunctive relief. She later filed an emergency motion for a preliminary injunction, asking this Court to compel the Jail to prescribe her methadone. She asks this Court to dictate what her medical care will be, before she has entered the Jail and before its medical team has had a chance to examine her.

Her claims are not yet ripe. Both claims hinge on whether she receives methadone in the future. That medical decision is a decision for a later day, after she is incarcerated. She is complaining about something that might – or might not – come to pass. The Jail might prescribe her methadone, or it might not. If it does, there is no live controversy. If it does not, then the Jail presumably will provide some other form of treatment, and the Court will know what it is. The Court cannot evaluate whether an alternative treatment passes constitutional muster without knowing what it is.

Plaintiff is asking this Court to dictate her medical care and decree what the Jail must do. But first, the Jail needs a chance to examine her and decide what treatment it is going to provide. At that point, there might be a dispute. And if there is a dispute, it will rest on real-world facts.

In the end, the entire dispute might not come to pass, because she might get what she wants. If she doesn't, then at least the Court will know what the alternative treatment is before opining on whether it complies with the Constitution and the ADA. In the meantime, the complaint rests on a hypothetical scenario, so it is not yet ripe for the exercise of judicial power. The complaint is dismissed (with leave to amend) for lack of ripeness.

## Background

Like millions of Americans, Finnigan has a long and difficult history with opioids. She has struggled with opioid use disorder for more than twenty years. *See* Decl. of Christine Finnigan, at ¶ 5 (Dckt. No. 22). Addiction also runs in her family. Three of her four brothers died of drug overdoses. So did her niece. *Id.* at ¶ 3. Finnigan is understandably concerned about her well-being. (And the Court is concerned for her, too.)

Over the last twenty years, Finnigan has tried to get clean a number of times. *Id*. at ¶ 6. She tried straight detoxification, that is, quitting cold turkey. But that never worked. *Id*. In 2002, she was prescribed buprenorphine, which she took for more than ten years. *Id*. at ¶ 7. During that period, her life completely turned around. She raised her four kids, got custody of two of her nephews, held a steady job, and eventually opened her own business (a nail salon). *Id*. at ¶ 7.

Around 2013 or 2014, shortly after the death of her mother, Finnigan stopped taking the buprenorphine. *Id*. at ¶¶ 8, 9. As she describes it, her life went into a "tail spin." *Id*. at ¶ 10. She had terrible withdrawal symptoms (including developing a seizure disorder), and eventually relapsed. *Id*. at ¶¶ 9, 11. She lost her job, her salon, and her home. *Id*. at ¶ 10. She also started drinking again after 16 years of sobriety. The drinking led to the DUI that underlies this case. *Id*. at ¶¶ 10, 12.

Finnigan started taking methadone as part of her recovery in 2019. *Id*. at ¶ 13; *see also* Decl. of Robert Reeves, M.D., at ¶¶ 9–12 (Dckt. No. 29) (describing Finnigan's course of treatment). Her doctor described methadone as a "life-saving medication that helps people enter and stay in recovery. It stabilizes brain chemistry, blocks the euphoric effects of opioids, and stops cravings so patients can focus on counseling, behavioral therapies, and recovery." *Id.* at ¶ 7.

At first, Finnigan was skeptical. But her brother's experience ultimately convinced her to give it a try. "I was open to going to the clinic because my only surviving brother, age 62, has been on methadone for twelve years. He spent most of his adult life in prison, but methadone turned his life around." *See* Decl. of Christine Finnigan, at ¶¶ 13, 14 (Dckt. No. 22).

3

Since she started taking methadone, Finnigan has noticed a dramatic change for the better. She explains: "I can think more clearly, take care of myself, and pay my bills. I am not currently using illegal drugs. I finally feel like myself again. I have no cravings whatsoever. Methadone works better for me than [buprenorphine] did." *Id.* at ¶ 16. She plans to take methadone for "years, possibly even for the rest of my life," in order to maintain her recovery. *Id.* at ¶ 18.

On January 21, 2021, Finnigan pleaded guilty to drunk driving. *Id.* at Ex. 1. She was sentenced to 60 days in jail, but only expects to serve 30 days on account of good-time credits. *See* Mem. of Law in Support of Pl.'s Emergency Mtn. for a Preliminary Injunction, at 1, 2 (Dckt. No. 19-1). She is due to report to the DuPage County Jail on February 25, 2021. *Id.* at 2.

Finnigan wants to continue receiving methadone during her incarceration. As she sees it, receiving methadone while incarcerated is a medical necessity. She supported her motion with a collection of declarations from physicians, including her own doctor (Dr. Robert Reeves) and an expert at treating opioid use disorder in correctional settings (Dr. Ross MacDonald). Her own doctor, Dr. Reeves, asserts that "[c]ontinuation of Ms. Finnigan's methadone – without any interruption of her daily dose – is medically necessary for her to remain in recovery." *See* Second Supp. Decl. of Robert Reeves, M.D., at ¶ 2 (Dckt. No. 59).

Both doctors opined about the importance of continuing to prescribe methadone to treat Finnigan's opioid addiction. In their view, absent exceptional circumstances, it is never medically appropriate to stop methadone treatment without supervised tapering. *See* Second Supp. Decl. of Ross MacDonald, M.D., at ¶¶ 2, 3 (Dckt. No. 64) ("Outside of rare circumstances where a life-threatening complication has developed, it is never medically appropriate to abruptly stop methadone treatment for opioid use disorder (OUD) (also known as 'cold turkey'),

without appropriate, medically supervised tapering."); Decl. of Robert Reeves, M.D., at ¶ 14 (Dckt. No. 29) ("Immediate cessation or forced tapering off these medications when incarcerated puts people at very high risk for relapse, overdose or death upon release.").

They also addressed what would happen if the DuPage County Jail does not continue her methadone treatment. According to them, Finnigan would experience excruciating withdrawal symptoms, as well as a greatly increased risk of relapse, overdose, and death. *See* Decl. of Ross MacDonald, M.D., at ¶ 11 (Dckt. No. 21) ("Symptoms of withdrawal include muscle pain, vomiting, diarrhea, depressed mood, insomnia and anxiety. Even if the patient is not actively vomiting or otherwise exhibiting obvious symptoms, he or she could still be experiencing physical suffering from withdrawal and as well as [sic] damaging psychological symptoms."); Decl. of Robert Reeves, M.D., at ¶ 17 (Dckt. No. 29) (listing withdrawal symptoms that Finnigan is likely to experience, including "craving to use opioids," and "extreme pain – including severe abdominal cramps, diarrhea, vomiting, tremors, body aches, chills, hot flashes, and insomnia").

Finnigan's counsel addressed the risk of death at a recent hearing, in response to the Court's questions. The risk of death stems from the possibility that she might relapse. Methadone suppresses the desire to take opioids. If she does not take methadone, she might take opioids again, and overdose. So the risk of death does not stem from stopping the use of methadone per se (*i.e.,* sitting in a room by herself without methadone will not lead to a fatality, if she has no access to opioids). Instead, the risk of death stems from the increased possibility that she may use opioids once again. *See* 2/19/21 Tr., at 41–46 (Dckt. No. 68); *see also* Pl.'s Mem. in Support of Mtn. for Preliminary Injunction, at 23 (Dckt. No. 27).

Finnigan thinks that it is inevitable that the DuPage County Jail will not give her methadone. She points to an article from the Chicago Tribune from 2018, which characterized

5

the Jail's practice of treating addiction through detoxification, not medication. *See* Decl. of Rebecca Joab, at ¶ 8, Ex. 3 (Dckt. No. 20). She also offered other declarations that addressed the likelihood of her receiving methadone. *See* Decl. of Rebecca Joab, at Ex. 1, Ex. 2, Ex. 4.; Decl. of Louis Lamoureux, at ¶¶ 3–5 (Dckt. No. 23); Decl. of Christine Finnigan, at ¶ 20, Ex. 2 (Dckt. No. 20).

During a recent hearing, the Court directed the DuPage County Jail to provide information about its track record of prescribing methadone to inmates with opioid addiction. In response, the Jail confirmed that it has prescribed methadone to treat opioid addiction to only one non-pregnant inmate in the past five years. *See* Defs.' Suppl. Reply in Support of their Mtn. to Dismiss, at ¶¶ 5, 6 (Dckt. No. 56). The last time the Jail prescribed methadone to treat opioid addiction was in 2016. *Id.* at ¶ 5. None of the inmates are currently receiving methadone for opioid addiction, but the Jail "does not currently have custody of any inmate who is medically indicated for receipt of methadone." *Id.* at ¶ 7.

The DuPage County Jail, for its part, rejects the notion that Finnigan's medical treatment is foreordained. The Jail insists that it is possible that it will prescribe methadone to Finnigan. It depends on her medical condition. And they want a chance to examine the soon-to-be patient before anyone decides what her treatment will be. The DuPage County Jail is willing to examine her right away – within 24 hours of her arrival. *See* Defs.' Supp. Reply, at 6 (Dckt. No. 53).

In its filings, the Jail has repeatedly represented that prescribing methadone for Finnigan is within the realm of possibility. They have not ruled it out. "Defendants will dispense Plaintiff methadone – if it is indicated based on Plaintiff's current medical needs – the moment an evaluated medical determination can be made." *Id.* at 5 n.2. And again: "Plaintiff's allegations that Defendants are refusing to consider methadone, and that they have a policy of outright MAT

6

[medication assisted treatment] refusal, are absolutely, demonstrably false." *Id.* at 6. Once more: "Again, on multiple occasions counsel for Defendants have indicated to Plaintiff (and Plaintiff's counsel) that Defendants will consider (and are considering) offering methadone treatment to Plaintiff." *See* Defs.' Resp. to Pl.'s Emergency Mtn. for Preliminary Injunction, at 5 (Dckt. No. 5) (emphasis in original); *see also id.* at 7 ("Defendants have indicated on multiple occasions that they are willing to consider offering Plaintiff MAT in the form of methadone, *should an evaluation of her medical record and physical intake examination indicate such treatment is medically necessary.*") (emphasis in original).

After expedited briefing, the Court presided over a hearing on February 19, 2021. The Court then ordered two rounds of supplemental briefing, directing the parties to address specific factual and legal questions. *See* 2/19/21 Order (Dckt. No. 50). Plaintiff has compiled an extensive record in a short period of time. She submitted 18 declarations. Two from herself, three from her doctor (Dr. Robert Reeves), three from a different doctor who is an expert at treating opioid use disorder (Dr. Ross MacDonald), three from experts on providing medication assisted treatment in correctional settings (Parrino and Hayes), and six from her attorneys. The last declaration came from the mother of an inmate who was denied his prescribed treatment while incarcerated at the DuPage County Jail. He overdosed shortly after he was released.

## Analysis

Federal courts have abundant but limited power. Article III vests federal courts with the power to decide "Cases" and "Controversies." U.S. CONST. art. III, § 2. The text of the Constitution "confines federal courts 'to the traditional role of Anglo-American courts, which is to redress or prevent actual or imminently threatened injury to persons caused by private or official violation of law.'" *Wisconsin Right to Life State Political Action Comm. v. Barland*, 664

7

F.3d 139, 146 (7th Cir. 2011) (citation omitted). The doctrines of ripeness and standing reinforce this limitation by "bar[ring] a plaintiff from asserting an injury that 'depends on so many future events that a judicial opinion would be advice about remote contingencies.'"[1] *Rock Energy Co-op. v. Vill. of Rockton*, 614 F.3d 745, 748 (7th Cir. 2010) (citation omitted). Without a live controversy that is ripe for decision, there is no room for the exercise of "judicial Power." U.S. CONST. art. III, § 2.

"Ripeness doctrine is based on the Constitution's case-or-controversy requirements as well as discretionary prudential considerations." *Barland*, 664 F.3d at 148. The doctrine's "underlying objective is to avoid premature adjudication and judicial entanglement in abstract disagreements." *Church of Our Lord & Savior Jesus Christ v. City of Markham, Illinois*, 913 F.3d 670, 676 (7th Cir. 2019) (citing *Pac. Gas & Elec. Co. v. State Energy Res. Conservation & Dev. Comm'n*, 461 U.S. 190, 200–01 (1983)).

The more in flux the facts, the greater the likelihood that the case is not ripe for the exercise of judicial power. "Ripeness concerns may arise when a case involves uncertain or contingent events that may not occur as anticipated, or not occur at all." *Barland*, 664 F.3d at 148; *see also* 13B Charles Alan Wright *et al.*, *Federal Practice and Procedure* § 3532.2 (3d ed. 2020) ("Many cases deny ripeness on the straight-forward ground that the anticipated events and injury are simply too remote and uncertain to justify present adjudication.").

---

[1] There is an "obvious overlap" between the doctrine of ripeness and the doctrine of standing. *See* Erwin Chemerinsky, *Federal Jurisdiction* § 2.4.1, at 124–25 (7th ed. 2016). A "threatened injury must be *certainly impending* to constitute injury in fact," and "'[a]llegations of *possible* future injury' are not sufficient." *See Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013) (quoting *Whitmore v. Arkansas*, 495 U.S. 149, 158 (1990)) (emphasis in original). A case about a hypothetical future injury could fall into either bucket, but in the end, the outcome is the same. *See* 13 Charles Alan Wright *et al.*, *Federal Practice and Procedure* § 3529 (3d ed. 2020) ("There is no reason to demand a final expression in terms of standing, ripeness, mootness, or political question doctrine, if – without relying on the frequently question-begging terminology of any single concept – the court is able to conclude that there is no sufficient need for deciding the issues tendered for decision.").

The ripeness doctrine helps to ensure that federal courts stay in their lane, by making decisions and exercising limited power when and only when there is a genuine controversy. It promotes the separation of powers. The ripeness doctrine helps to keep courts from injecting themselves unnecessarily in the decisions of other branches of government. *See Abbott Labs. v. Gardner*, 387 U.S. 136, 148 (1967) ("Without undertaking to survey the intricacies of the ripeness doctrine it is fair to say that its basic rationale is to prevent the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements over administrative policies, and also to protect the agencies from judicial interference until an administrative decision has been formalized and its effects felt in a concrete way by the challenging parties."); Erwin Chemerinsky, *Federal Jurisdiction* § 2.4.1, at 127 (7th ed. 2016) ("Ripeness advances separation of powers by avoiding judicial review in situations where it is unnecessary for the federal courts to become involved because there is not a substantial hardship to postponing review."); 13B Charles Alan Wright *et al.*, *Federal Practice and Procedure* § 3532.1 (3d ed. 2020) ("As with standing, mootness, and other justiciability doctrines, the values of avoiding unnecessary constitutional determinations and establishing proper relationships between the judiciary and other branches of the federal government lie at the core of ripeness policies."); 15 James Wm. Moore *et al.*, *Moore's Federal Practice* § 101.70 (3d ed. 2020) ("The ripeness doctrine . . . asks whether the case has been brought at a point so early that it is not yet clear whether a real dispute to be resolved exists between the parties. In this sense, the ripeness requirement furthers the interests of judicial restraint by avoiding possible judicial interference with the other branches of government that would ultimately prove unnecessary if a live dispute were never to develop.").

It also leads to better decision-making. *See* Erwin Chemerinsky, *Federal Jurisdiction* § 2.4.1, at 127 (7th ed. 2016) ("[R]ipeness is said to enhance the quality of judicial decision making by ensuring that there is an adequate record to permit effective review."). Ripeness reinforces the notion that courts must make decisions based on real-world facts, not hypothetical facts that may or may not come to pass.

The need to avoid unnecessary entanglements is especially sensitive when, as here, the case involves a state agency (raising federalism concerns) on a medical issue (raising institutional competence concerns) in a custodial setting (raising prison-management concerns). *See generally* 13B Charles Alan Wright *et al.*, *Federal Practice and Procedure* § 3532.1 (3d ed. 2020); *see also Kingsley v. Hendrickson*, 576 U.S. 389, 399–400 (2015); *Mays v. Dart*, 974 F.3d 810, 820–21 (7th Cir. 2020); *Money v. Pritzker*, 453 F. Supp. 3d 1103, 1129 (N.D. Ill. 2020) (Dow, J.) ("The Supreme Court repeatedly has cautioned that federal courts must tread lightly when it comes to questions of managing prisons, particularly state prisons.").

To determine whether a claim is ripe, a court must weigh (1) "the fitness of the issues for judicial decision," and (2) "the hardship to the parties of withholding court consideration." *Barland*, 664 F.3d at 148 (quoting *Pac. Gas & Elec. Co.*, 461 U.S. at 201). "Both aspects of the inquiry involve the exercise of judgment, rather than the application of a black-letter rule." *Nat'l Park Hosp. Ass'n v. Dep't of Interior*, 538 U.S. 803, 814 (2003) (Stevens, J., concurring). "Because ripeness is 'peculiarly a question of timing,' a court determines ripeness as of the date of its decision, not the date the lawsuit was filed." *Church of Our Lord & Savior Jesus Christ*, 913 F.3d at 677 (citation omitted).

The first prong – the "fitness" of a particular issue for "judicial decision" – turns on how much the existence or identity of the issue could be impacted by future factual development.

That is, an issue is unfit for judicial review when it rests upon "contingent future events that may not occur as anticipated, or indeed may not occur at all." *Texas v. United States*, 523 U.S. 296, 300 (1998); *see also Barland*, 664 F.3d at 148; *Capeheart v. Terrell*, 695 F.3d 681, 685 (7th Cir. 2012) (explaining that issues resting on the enactment of proposed polices are rarely ripe because a "proposed policy may never come into force and, even if it does, it could well change during the process that takes it from a possible rule to an actual one").

The second prong – the hardship to the parties of withholding consideration – is "entirely prudential." *McInnis-Misenor v. Maine Med. Ctr.*, 319 F.3d 63, 70 (1st Cir. 2003). A party challenging a particular policy can demonstrate hardship by showing "either that: (1) enforcement [of a challenged policy] is certain, only delayed; or (2) even though enforcement is not certain, the mere threat of future enforcement has a present concrete effect on [the party's] day-to-day affairs and irremediably adverse consequences would flow from a later challenge." *Metro. Milwaukee Ass'n of Commerce v. Milwaukee Cty.*, 325 F.3d 879, 882 (7th Cir. 2003); *see also* Erwin Chemerinsky, *Federal Jurisdiction* § 2.4.2, at 127–35 (7th ed. 2016) (explaining the hardship prong).

This case is not yet ripe for decision. Maybe Finnigan will receive methadone at the Jail, and maybe she won't. Maybe the alternative treatment (if any) will be constitutionally adequate, and maybe it won't. Maybe any alternative treatment will be so inadequate that it would justify the extraordinary use of injunctive relief, and maybe it won't. No one knows.

The DuPage County Jail does not yet have custody of Finnigan. The Jail's physicians have not given her a medical examination, let alone decided what treatment is appropriate for her in light of her condition. The Jail has not ruled out the possibility of prescribing her methadone. But they can't know until they examine her. Examination first, treatment decision second.

In the meantime, there is no live dispute between the parties. Finnigan complains about a set of facts that may or may not come to pass. She might disagree with the treatment. But maybe not. It is possible that the Jail will prescribe her methadone. And if it does, there will be no need for this Court to immerse itself in her medical care.

As things stand, Finnigan cannot say that her medical care will be inadequate because she does not know what her medical care will be. And the Court cannot assess an alternative treatment plan – if any – without knowing what it is. It is difficult to evaluate whether medical care is inadequate when no one has decided what the medical care will be. Instead of relying on "powers of imagination," the issue is "better grasped when viewed in light of a particular application." *Texas v. United States*, 523 U.S. 296, 301 (1998).

A motion for a preliminary injunction is particularly unlikely to be ripe when the plaintiff requests a specific treatment, and there is a range of possible medical alternatives. To prevail, Finnigan would need to show a likelihood of success on the merits. *See Illinois Republican Party v. Pritzker*, 973 F.3d 760, 762–63 (7th Cir. 2020). A mere "possibility of success is not enough" – the likelihood must be "strong." *Id.* at 762. It is difficult to see how Finnigan could show a strong likelihood of success on the merits when she does not know what her medical will be, and does not know anything about the Defendants' state of mind.

The Eighth Amendment requires a showing of deliberate indifference to an inmate's serious medical needs. "To determine if the Eighth Amendment has been violated in the prison medical context, we perform a two-step analysis, first examining whether a plaintiff suffered from an objectively serious medical condition, and then determining whether the individual defendant was deliberately indifferent to that condition." *Peterson v. Wexford Health Sources,*

*Inc.*, 986 F.3d 746, 751 (7th Cir. 2021) (quoting *Petties v. Carter*, 836 F.3d 722, 727–28 (7th Cir. 2016)).

To satisfy the subjective component, the complaint must allege that the defendants acted with a "sufficiently culpable state of mind." *Id.* at 752 (quoting *Farmer v. Brennan*, 511 U.S. 825, 834 (1994)). The subjective standard "requires more than negligence and approaches intentional wrongdoing." *Holloway v. Delaware Cty. Sheriff*, 700 F.3d 1063, 1073 (7th Cir. 2012). "The Supreme Court has compared the deliberate indifference standard to that of criminal recklessness." *Id.* (citing *Farmer*, 511 U.S. at 837).

An inmate might "prefer[]" to receive a particular medicine instead of "substitutes," but a "prisoner is not entitled to receive 'unqualified access to healthcare.'" *Id.* (quoting *Hudson v. McMillian*, 503 U.S. 1, 9 (1992)). "There is not one 'proper' way to practice medicine in prison, but rather a range of acceptable courses based on prevailing standards in the field." *Jackson v. Kotter*, 541 F.3d 688, 697 (7th Cir. 2008). "A cause of action based on a physician's choice among courses of treatment cannot be sustained under the Eighth Amendment." *Eagan v. Dempsey*, 2021 WL 456002, at *17 (7th Cir. Feb. 9, 2021).

"For a medical professional to be held liable under the deliberate indifference standard, he must make a decision that is 'such a substantial departure from accepted professional judgment, practice, or standards, as to demonstrate that the person responsible actually did not base the decision on such a judgment.'" *Holloway*, 700 F.3d at 1073 (citing *Jackson*, 541 F.3d at 697); *see also Arnett v. Webster*, 658 F.3d 742, 751 (7th Cir. 2011) ( "A plaintiff can show that the professional disregarded the need only if the professional's subjective response was so inadequate that it demonstrated an absence of professional judgment, that is, that 'no minimally competent professional would have so responded under those circumstances.'") (quoting *Roe v.*

13

*Elyea*, 631 F.3d 843, 857 (7th Cir. 2011)); *Duckworth v. Ahmad*, 532 F.3d 675, 679 (7th Cir. 2008) ("Deliberate indifference is not medical malpractice; the Eighth Amendment does not codify common law torts.").

The Court cannot evaluate whether the doctors acted with deliberate indifference to her medical needs when they have not yet made any decision. They have no state of mind about a decision that they have not yet made. No one knows if the doctors will make a decision with a culpable state of mind before the doctors have made the decision.

The elements are different under the ADA, but the ripeness analysis is much the same. To prevail on her ADA claim, Finnegan would have to prove that (1) she is a "qualified individual with a disability," (2) she was denied "the benefits of the services, programs, or activities of a public entity" or otherwise subjected to discrimination by such an entity, and (3) the denial or discrimination was "by reason of" her disability. *See* 42 U.S.C. § 12132; *see also Love v. Westville Corr. Ctr.*, 103 F.3d 558, 560 (7th Cir. 1996). That claim involves the same "fitness" issues as the Eighth Amendment claim. No one knows whether the Jail will prescribe her methadone, and if it does not, what the alternative will be. It is too soon to address whether an accommodation is reasonable without knowing what it is. It is too soon to address disparate treatment, too.

Both factors of the ripeness analysis weigh against a finding that this case raises a live controversy. *See Barland*, 664 F.3d at 148 (requiring courts to consider (1) "the fitness of the issues for judicial decision," and (2) "the hardship to the parties of withholding court consideration"). The issue is not fit for a judicial decision because the Jail has not yet made a medical decision. At this point, the outcome of the medical exam is entirely speculative. *See Texas v. United States*, 523 U.S. 296, 300 (1998) ("Under these circumstances, where 'we have

14

no idea whether or when such [a sanction] will be ordered,' the issue is not fit for adjudication.") (citation omitted; brackets in original). The order is backwards – the doctors should make a decision about her medical care before the judiciary.

From a hardship standpoint, Finnigan argues that she will suffer hardship if she does not receive methadone. But at this juncture, her future medical treatment is entirely speculative. *See* Erwin Chemerinsky, *Federal Jurisdiction* § 2.4.2, at 127 (7th ed. 2016) ("[T]he more speculative and uncertain the harm, the less likely it is that review will be granted."). Finnigan adds that she will suffer anxiety as she approaches incarceration and awaits the doctors' decision, and understandably so. *See* Supp. Decl. of Christine Finnigan, at ¶¶ 2–4 (Dckt. No. 56). But that hardship is not enough to justify an order compelling doctors to prescribe a specific medicine to a specific patient who they have not yet examined.

Finnigan offers two cases to support the notion that this case presents a live controversy. *See Smith v. Aroostook Cty.*, 376 F. Supp. 3d 146 (D. Me. 2019); *Pesce v. Coppinger*, 355 F. Supp. 3d 35 (D. Mass. 2018). In each case, the soon-to-be inmate filed a motion for a preliminary injunction, seeking an order directing the prisons to prescribe a particular medicine for opioid use disorder (one case involved buprenorphine, and the other involved methadone). But there, unlike here, the medical outcome was certain. In *Smith*, the prison "state[d] categorically that buprenorphine is not allowed in the Defendants' facility[.]" *Smith*, 355 F. Supp. 3d at 155. In *Pesce*, there was a "blanket policy prohibiting the use of methadone treatment" at the facility. *Pesce*, 355 F. Supp. 3d at 47. Not so here.

The Court lacks power to render a decision when there is no live controversy, so the complaint is dismissed. But the dismissal does not deprive Finnigan of the opportunity to seek a judicial remedy, when the time is right – perhaps a few days from now. The Court grants leave

15

to file an amended complaint if and when the case becomes ripe. *See* Fed. R. Civ. P. 15(a)(2). The claims are not ripe now, but a new claim might be ripe soon.

## Conclusion

"Before rushing to decision, courts must pause to consider other matters. Chief among these are the need for a better developed set of concrete facts to inform decision, the difficulty of the legal issues presented in relation to the need for facts and the injury to be redressed, and the sensitivity of the legal issues in relation to the proper role of the judiciary." *See* 13B Charles Alan Wright *et al.*, *Federal Practice and Procedure* § 3532.2 (3d ed. 2020).

The complaint is dismissed for lack of ripeness, and the motion for a preliminary injunction is denied on ripeness grounds, too. The Court grants Plaintiff leave to amend the complaint if the dispute ripens into a case or controversy.

Date: February 24, 2021

Steven C. Seeger
United States District Judge